UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YOLANDA HENDERSON, individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | ) 15 C 3897<br>) |
| U.S PATENT COMMISSION, LTD., THE GRAY LAW GROUP, LTD., ZAMBRO MANUFACTURING, INC., INVENT WORLDWIDE CONSULTING, LLC, RON STERLING, ALAN GREEN, CAROLYN ROHDE, ANGELA STEVENS, CANDICE PAGE, ROBERT GRAY, STEVEN FISHER-STAWINSKI, XAVIER HAILEY, and LOUIS D'AMICO, | ) Judge Feinerman<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Yolanda Henderson brought this putative class action against U.S. Patent Commission, Ltd. and several of its employees (collectively, "Commission Defendants"), The Gray Law Group and several of its employees (collectively, "Gray Defendants"), Zambro Manufacturing, Inc. and its employee Louis D'Amico, and Invent Worldwide Consulting, LLC. The complaint alleges violations of the American Inventor's Protection Act ("AIPA"), 35 U.S.C. § 297 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Illinois Fair Invention Development Standards Act ("FIDSA"), 815 ILCS 505/1, *et seq.*, the Minnesota Invention Services Act ("MISA"), Minn. Stat. § 325A.01, *et seq*., and the Illinois and Minnesota consumer fraud statutes. Doc. 1. Gray Defendants have moved to compel arbitration, Doc. 33, as have Commission Defendants and Invent, Doc. 36. Both motions are granted.

**Background**

On a motion to compel arbitration, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in [her] favor." *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002) (internal quotation marks omitted).

Believing that she had created a new invention, "glitter paint, which is paint with glitter in it," Henderson contacted U.S. Patent Commission, formerly known as Invent Worldwide Consulting, a firm that purports to aid inventors in developing and selling their products. Doc. 1 at ¶¶ 22-23, 25, 67. Following communications with Henderson in February 2014 and pursuant to a contract called the "Step 1 Agreement," U.S. Patent Commission and Invent charged Henderson $100.00 to perform what the parties call a Step 1 patent search to determine the patentability of her invention. *Id*. at ¶¶ 24, 28, 29; Doc. 33-2 at 2-3. Defining U.S. Patent Commission and Invent Worldwide Consulting as "Consultants" and Henderson as "Client," the Step 1 Agreement provides that "Consultants agree to hire licensed, registered Attorneys to provide any legal services for Client" and that "[t]he amounts paid to Consultants include the cost of those Attorneys and their services." Doc. 33-2 at 2. The agreement contains this choice-of-law and arbitration clause:

> This agreement, and all other agreements with Consultants, unless specifically noted otherwise are interpreted in accordance with the laws of the State of Illinois and the County of DuPage. Any and all disputes regarding this or other agreements between Client and Consultants will be subject to binding arbitration and submitted to the AAA (American Arbitration Association) or some other similar organization. Consultants shall be entitled to injunctive relief against any and all litigation filed by Client or on Client's behalf, no matter the stated or implied cause of action in such matter.

*Id*. at 3.

On February 26, 2014, despite abundant, easily accessible online evidence that glitter paint was "not novel, non-obvious, or otherwise unavailable to the public," U.S. Patent

2

Commission recommended that Henderson file a provisional patent application, stating that it "[could] not emphasize enough the importance of filing for protection sooner rather than later." Doc. 1 at ¶¶ 30, 31 & n.2. On March 4, 2014, Caryn Rohde, a U.S. Patent Commission project manager, sent an email to Henderson with the "Step 2 Agreement," under which U.S. Patent Commission would "creat[e] 2D and 3D drawings of the invention, provid[e] [Henderson] with a list of manufacturers, and fil[e] a provisional patent application with the United States Patent and Trademark Office ('USPTO')." *Id*. at ¶¶ 32-33. Henderson agreed to pay $2,600.00 for the services set forth in the Step 2 Agreement. *Id*. at ¶ 32. The Step 2 Agreement contains an arbitration clause identical to the one in the Step 1 Agreement. Doc. 33-3 at 4.

As part of its Step 2 services, U.S. Patent Commission customarily retains Gray Law Group to file provisional patent applications with the USPTO. Doc. 1 at ¶¶ 37, 40. Steven Fisher-Stawinski, a senior associate at Gray Law Group, contacted Henderson about her invention, and Henderson, Fisher-Stawinski, Gray, and Rohde, in a series of emails in late October 2014, discussed filing a provisional patent application. *Id*. at ¶¶ 42-43. On October 29, 2014, Fisher-Stawinski filed a provisional patent application with the USPTO, and the USPTO granted the application on November 18, 2014. *Id*. at ¶¶ 44, 46.

After receiving the provisional patent, U.S. Patent Commission provided Henderson's contact information to Zambro Manufacturing, which offers "invention promotion and development services." *Id*. at ¶¶ 43, 48-49. On February 19, 2015, D'Amico sent Henderson a Zambro contract related to manufacturing and marketing glitter paint. *Id*. at ¶ 49. The complaint does not indicate whether Henderson signed that contact, and Zambro and D'Amico have yet to be served in this case.

On May 4, 2015, Henderson filed this suit. Doc. 1. The complaint alleges that Defendants conspired to deceive her from discovering that glitter paint was neither patentable nor profitable, thereby violating both federal and state law.

## Discussion

As noted, Commission Defendants, Invent Worldwide, and Gray Defendants have moved to compel arbitration. Section 2 of the Federal Arbitration Act ("FAA") states, in relevant part:

> A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 2 "mandates enforcement of valid, written arbitration agreements," *Tinder*, 305 F.3d at 733, and "embodies both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (internal quotation marks omitted). "To give effect to the federal policy favoring private arbitration, the FAA provides stays of litigation when an issue presented in the case is referable to arbitration." *Tinder*, 305 F.2d at 733 (citing 9 U.S.C. § 3). "[B]ecause arbitration is a matter of contract, a party cannot be required to submit to arbitration any dispute which has not agreed so to submit." *Gore*, 666 F.3d at 1032 (internal quotation marks omitted).

Courts "evaluate agreements to arbitrate under the same standards as any other contract," *Tinder*, 305 F.2d at 733, which include "all general principles of state law," *Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 791 (7th Cir. 2013). *See Gore*, 666 F.3d at 1032 ("courts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms") (quoting *AT&T Mobility LLC v. Concepcion*, 131 S. Ct., 1740, 1745 (2011)); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011); *Zurich Am. Ins.*

*Co. v. Watts Indus.*, 466 F.3d 577, 580 (7th Cir. 2006). When "determin[ing] whether a contract's arbitration clause applies to a given dispute, federal courts apply state-law principles of contract formation," but "[o]nce it is clear … that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore*, 666 F.3d at 1032 (internal quotation marks omitted). Accordingly, "a court may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Ibid.* (internal quotation marks omitted); *see also Am. Int'l Specialty Lines Ins. Co. v. Elec. Data Sys. Corp.*, 347 F.3d 665, 671 (7th Cir. 2003) ("A trial to determine arbitrability is required … only if the issue that an evidentiary hearing would resolve is fairly contestable."). "[J]ust as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Tinder*, 305 F.3d at 735.

The Step 1 and Step 2 Agreements are governed by Illinois law. Doc. 33-2 at 3; Doc. 33-3 at 4. "As a general matter in Illinois, [o]nly signatories to an arbitration agreement can file a motion to compel arbitration." *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 734 (7th Cir. 2005) (quoting *Bishop v. We Care Hair Dev. Corp.*, 738 N.E.2d 610, 619 (Ill. App. 2000)) (alteration in original) (internal quotation marks omitted). Because U.S. Patent Commission and Invent Worldwide signed both agreements, they may seek to enforce the arbitration clauses.

Although Gray Defendants and the individual Commission Defendants are not signatories to the agreements, they also may seek to enforce the arbitration clauses. "[A] nonparty to a contract cannot enforce the contract … unless it is a third party beneficiary." *IDS Life Ins. Co. v.*

*SunAmerica, Inc.*, 103 F.3d 524, 529 (7th Cir. 1996). "Illinois recognizes two types of third-party beneficiaries, intended and incidental. An intended beneficiary is intended by the parties to the contract to receive a benefit for the performance of the agreement and has rights and may sue under the contract; an incidental beneficiary has no rights and may not sue to enforce them." *Cont'l Cas.*, 417 F.3d at 734 (quoting *Estate of Willis v. Kiferbaum Constr. Corp.*, 830 N.E.2d 636, 643 (Ill. App. 2005)). The agreements do not mention Gray Defendants by name, but they indisputably are the "licensed, registered Attorneys" to which the agreements refer, Doc. 33-2 at 2; Doc. 33-3 at 2, and because the agreements "describe[e] the class to which they belong," they qualify as intended third-party beneficiaries. *Cont'l Cas.*, 417 F.3d at 734. The individual Commission Defendants are the "Consultants" referenced in the agreements, and thus are entitled to invoke the arbitration clauses as well. Agency principles provide an independent basis for recognizing the individual Commission Defendants as third-party beneficiaries. *See Belom v. Nat'l Futures Ass'n*, 284 F.3d 795, 799 (7th Cir. 2002) (holding that an employer's arbitration agreement binds and benefits the employer's employee).

Henderson does not dispute that most of her claims fall within the arbitration clauses' scope. Doc. 43 at 17-20. She argues, however, that the FIDSA and MISA claims are not governed by the arbitration clauses because certain allegations underlying those claims predate the agreements. *Id*. at 20-21. That argument fails to persuade. The arbitration clauses broadly encompass "[a]ny and all disputes regarding this or other agreements between Client and Consultants." Docs. 33-2 at 3; Doc. 33-3 at 4. As the Seventh Circuit has held, "broad language necessarily create[s] a presumption of arbitrability, which requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of the arbitration." *Gore*, 666 F.3d at 1034 (alterations in original) (internal quotation marks omitted). Although the FIDSA and

6

MISA claims pertain in part to events predating the agreements, allegations arising from those events "regard[]" the agreements—they are closely related to the transactions set forth in the agreements—and the claims themselves are premised on the notion that the agreements are governed by FIDSA and MISA—a determination that, as it affects the validity of the agreements as a whole and as explained immediately below, is reserved for the arbitrator. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006).

Henderson offers two arguments for why arbitration should not be compelled even assuming that the arbitration clauses govern all of her claims. Her arguments are unpersuasive.

First, Henderson contends that the Step 1 and Step 2 Agreements are void and unenforceable for failure to comply with FIDSA and MISA. Doc. 43 at 7-11. However, settled law holds that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Buckeye Check Cashing*, 546 U.S. at 449. Thus, when deciding whether to compel arbitration, the court may consider the validity only of the agreements' arbitration clauses, not of the agreements themselves. *See id*. at 445-46 ("[B]ecause respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court."); *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010) ("[W]hen faced with motions to stay suits or order arbitration, courts should evaluate only the validity of the arbitration agreement; challenges to the validity of the entire contract … should be left to the arbitrator"); *Parkland Envtl. Grp., Inc. v. Laborers' Int'l Union of N. Am.*, 390 F. App'x 574, 576 (7th Cir. 2010) (holding that "a claim of fraud in the inducement of the contract generally, … as opposed to a claim of fraud in the inducement of just the arbitration provisions[,]" is for the arbitrator and not the court). It follows that in

deciding whether to enforce the arbitration clauses, the court cannot consider whether the agreements themselves violate FIDSA and MISA.

Second, Henderson contends that the arbitration clauses are procedurally and substantively unconscionable under Illinois law. Doc. 43 at 11-17. Procedural unconscionability, which is addressed first, turns on "the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Cannon v. Burge*, 752 F.3d 1079, 1102 (7th Cir. 2014) (quoting *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. App. 1980)). Henderson asserts that the agreements were "adhesion contracts between a sophisticated business and an unsophisticated individual consumer … presented to [her] on a 'take-it-or-leave-it' basis." Doc. 43 at 13. She further asserts that the agreements "[did] not give [her] notice … of the potential costs of arbitration" and "failed to comply with the disclosure requirements of" FIDSA and MISA, and that "the arbitration clauses [were] hidden in the Contracts." *Id.* at 13-14. For these reasons, Henderson argues, "she was not fully informed of the effect of entering into Contracts with Defendants." *Id.* at 13.

Even if the agreements were adhesion contracts and Henderson had no opportunity to modify their terms, those factors alone would not establish procedural unconscionability under the circumstances of this case. Contrary to Henderson's submission, the arbitration clauses are not hidden, but rather are presented in type of the same color and size as the rest of the agreement. Doc. 33-2 at 3; Doc. 33-3 at 4. Further, under Illinois law, "a party to a contract is charged with knowledge of an assent to a signed agreement." *Faulkenberg*, 637 F.3d at 809 (citing *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 108 (Ill. 2006)). Henderson signed both agreements, and thus is deemed to have knowingly assented to their terms, including the

arbitration provisions. *See ibid*. ("[The parties challenging the arbitration clause's validity] had a duty before signing the … agreement to read and understand its contents. Ignorance of the contract's arbitration provision is no defense if they failed to read the contract before signing.") (citations omitted). Henderson's argument regarding the FIDSA and MISA disclosure requirements concerns the validity of the agreements as a whole, and thus is for the arbitrator, not the court.

Although Defendants undoubtedly had more bargaining power than Henderson, "Illinois law does not void contracts where parties have unequal bargaining power, even if a contract is a so-called 'take-it-or-leave-it' deal," absent fraud by the advantaged party. *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 367 (7th Cir. 1999) (quoting *Kewanee Prod. Credit Ass'n v. G. Larson & Sons Farms*, 496 N.E.2d 531, 534 (Ill. App. 1986)). Henderson alleges that Defendants' scheme contained fraudulent elements, Doc. 1 at ¶¶ 60, 62-65, 67-68, 70, 78, but those elements do not relate to the arbitration provisions themselves; they instead affect the validity of the agreements as a whole and thus, again, are matters for the arbitrator. *See Buckeye Check Cashing*, 546 U.S. at 449; *Janiga*, 615 F.3d at 741. Finding procedural unconscionability here would invalidate the vast majority of modern consumer contracts. As the Supreme Court of Illinois has noted in terms equally applicable here:

> The … service agreement is a contract of adhesion. The terms, including the arbitration clause and the class action waiver therein, are nonnegotiable and presented in fine print in language that the average consumer might not fully understand. Such contracts, however, are a fact of modern life. Consumers routinely sign such agreements to obtain credit cards, rental cars, land and cellular telephone service, home furnishings and appliances, loans, and other products and services. It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable.

*Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 266 (Ill. 2006).

So the arbitration clauses are not procedurally unconscionable, which leaves substantive unconscionability. Under Illinois law, substantive unconscionability

> concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. … Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.

*Jackson v. Payday Fin., LLC*, 764 F.3d 765, 778 (7th Cir. 2014) (quoting *Kinkel*, 857 N.E.2d at 267); *see also Cannon*, 752 F.3d at 1102. Henderson's substantive unconscionability argument rests on three grounds: (1) failure to make the disclosures required by FIDSA and MISA; (2) the alleged one-sidedness of the arbitration clauses; and (3) the "cost-price disparity" related to Henderson bringing claims "not commonly known to consumers." Doc. 43 at 14-17.

The first two grounds are non-starters. As noted, Defendants' compliance or non-compliance with FIDSA and MISA is a matter for the arbitrator. And Henderson offers no evidence suggesting that the arbitration clauses are one-sided. Instead, she notes that because "Defendants pre-drafted the Contracts, [she] did not have the ability or bargaining power to negotiate the terms." *Id.* at 16. This essentially reprises her procedural unconscionability argument, which, as shown above, is unpersuasive.

That leaves the alleged cost-price disparity. Because Henderson is "seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive," she "bears the burden of showing the likelihood of incurring prohibitive costs." *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 557 (7th Cir. 2003) (internal quotation marks omitted). Yet Henderson has "not offered any specific evidence of arbitration costs that [she] may face in this litigation, prohibitive or otherwise, and [has] failed to provide any evidence of [her] inability to pay such costs." *Ibid*. Citing the $2,700.00 that she paid under the agreements, Henderson argues that because "Defendants are sophisticated parties, including experienced

patent attorneys and invention developers," they "are aware of laws regulating invention developers," which she "must obtain legal assistance to even discover." All of this might be true, but such a "bare assertion of prohibitive costs, without more, is too speculative and insufficient" to defeat a motion to compel arbitration. *See ibid*. Moreover, several of the statutes under which Henderson sues allow the prevailing party to recover its attorney fees, *see* 18 U.S.C. § 1964(c) (RICO) ("Any person injured in his business or property by reason of a [RICO] violation … shall recover … cost of the suit, including a reasonable attorney's fee."); 815 ILCS 620/505(2) (Illinois consumer fraud) ("[T]he court may award reasonable attorney's fees."); Minn. Stat. § 325A.09, Subd. 5 (MISA) ("Any person who has been injured by a violation" of the statute "may . . . bring a civil action . . . for the damages sustained together with costs and disbursements, including reasonable attorney's fees."), and those fees would be recoverable in arbitration. *See Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 332 (7th Cir. 1995) (enforcing an arbitrator's award of statutory attorney fees); *see also George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577 (7th Cir. 2001) (evaluating the arbitrator's denial of statutory attorney fees); *Koveleskie*, 167 F.3d at 366 (same). In short, without "individualized evidence that [she] likely will face prohibitive costs in the arbitration … and that [she] is financially incapable of meeting those costs," *Livingston*, 339 F.3d at 557, Henderson has not made a showing of substantive unconscionability.

Henderson advances no other grounds for avoiding arbitration, so any such grounds are forfeited. *See G & S Holdings LLC v. Cont'l Cas. Co.,* 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Milligan v. Bd. of Trs. of S. Ill. Univ.,* 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he

11

forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument.").

**Conclusion**

For the foregoing reasons, the court grants the motions to compel arbitration. Henderson must arbitrate her claims against Gray Defendants, Commission Defendants, and Invent Worldwide Consulting. Those claims are stayed in this court pending the arbitration. *See IDS Life*, 103 F.3d at 528 ("In a suit 'upon any issue referable to arbitration under an agreement in writing for such arbitration,' the court, upon determining that the issue involved in the suit is indeed referable to arbitration, shall upon application of a party stay the judicial proceeding.") (quoting 9 U.S.C. § 3); *Kroll v. Doctor's Assocs., Inc.*, 3 F.3d 1167, 1171 (7th Cir. 1993) (holding that 9 U.S.C. § 3 "plainly requires that a district court stay litigation where issues presented in the litigation are the subject of an arbitration agreement") (internal quotation marks and emphasis omitted). This outcome might or might not be optimal as a policy matter, *see generally Porreca v. Rose Grp.*, 2013 WL 6498392 (E.D. Pa. Dec. 11, 2013), but it is the outcome required by law.

November 1, 2015

United States District Judge